UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LONNETTE GREENE,

                                    Plaintiff,

            -against-

BEN CARSON, in his official capacity as
SECRETARY OF HOUSING AND URBAN
DEVELOPMENT, and DESHLER APTS.
ASSOCS. L.P.,

                                    Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/14/17

14 Civ. 3676 (AT) (GWG)

**OPINION
AND ORDER**

ANALISA TORRES, District Judge:

For most of her life, Plaintiff, Lonnette Greene, resided in an apartment complex owned

by Defendant Deshler Apartment Associates, L.P. ("Deshler"). The building is a "project-based"

Section 8 low-income housing development subsidized by the United States Department of

Housing and Urban Development (with Defendant Ben Carson, Secretary of Housing and Urban

Development, "HUD") pursuant to 42 U.S.C. § 1437f.[1] In or prior to 2007, without Greene's

knowledge, Greene's mother removed Greene from the household composition forms. Greene

continued to live in the apartment. When Greene's mother moved out and Greene sought to take

over the lease, Defendants denied Greene the continuation of the Section 8 subsidy because she

was not a party to the lease. Greene brings suit to challenge that determination, alleging

violations of the Due Process Clause and the Administrative Procedure Act ("APA"). HUD

---

[1] There are "two forms of section 8 housing: 'tenant-based' and 'project-based.' In tenant-based
housing, an assisted family selects their home and their assistance[] travels with them should
they move. In project-based housing, rental assistance is provided to families who live in
designated developments or units." *Valentine Props. Assocs., LP v. U.S. Dep't of Hous. &
Urban Dev.*, 785 F. Supp. 2d 357, 364 (S.D.N.Y. 2011) (citation omitted) (citing 24 C.F.R.
§ 982.1(b)).

moves for judgment on the pleadings and summary judgment. For the reasons stated below, HUD's motions are GRANTED in part and DENIED in part.

## BACKGROUND

### I. Factual Background

Between 2007 and 2012, Deshler owned Deshler Apartments, located at 1871 Seventh Avenue, New York, New York 10026. *See* Joint Rule 56.1 Statement ("56.1") ¶¶ 12-13, ECF No. 81; Decl. of Natasha L. Waglow ("Waglow Decl.") Ex. A ("Colon Dep. 1"), at 15:20-23, ECF No. 61.[2] Manhattan North Management Company, Inc. ("Manhattan North") served as managing agent. 56.1 ¶ 13. Richard Colon is Manhattan North's director of recertification and compliance. Colon Dep. 1 at 10:18-11:5. To administer the Section 8 program in New York, HUD employs the New York State Housing Trust Fund, which in turn subcontracts its work to CGI Federal ("CGI"). 56.1 ¶¶ 22, 23. Since 2005, CGI has been the HUD contract administrator for Deshler Apartments. 56.1 ¶ 24; Waglow Decl. Ex. E ("Van Loan Dep."), at 5:18-24, 28:4. CGI's responsibilities include processing subsidy payments and contract renewals and operating a call center to field tenant complaints. 56.1 ¶¶ 23-25; Van Loan Dep. 6:8-18, 8:7-15. Until 2011, CGI was also responsible for conducting a "management and occupancy review" of Deshler, a process by which CGI monitored Deshler's compliance with Section 8 program requirements. *See* Van Loan Dep. 33:7-34:11.

From the mid-1980s onward, Greene resided in Deshler Apartments. Colon Dep. 1 at 15:20-16:6; Greene Dep. 13:23; 56.1 ¶ 12. Initially, Greene lived in apartment 4C, a two-

---

[2] Greene currently resides at 124 West 114th Street in Manhattan. *See* Waglow Decl. Ex. F ("Greene Dep."), at 13:17-25. The parties do not appear to dispute that that building and the building Greene resided during the time relevant to her claims both constitute "Deshler Apartments." *See* 56.1 ¶ 102; Greene Dep. 12:20-13:22, 28:10. Therefore, the Court will use the term "Deshler Apartments" when referring to either.

bedroom unit, with her mother, father, sister, and brother. 56.1 ¶ 29. In 1998, Greene moved

with her family to apartment 6B (the "Apartment"). 56.1 ¶¶ 30, 32. The lease for the Apartment

was signed by Greene's mother, Dawn Lawless, and outlined the tenant's and the landlord's

respective responsibilities as to reporting and verifying information necessary to calculate

Lawless' rent and comply with the Section 8 requirements. *See* 56.1 ¶¶ 32, 37-38. Among other

provisions, the lease obligated Lawless to report if a "household member moves out of the unit."

56.1 ¶ 38. On June 30, 2003, Lawless signed a new lease for the Apartment, which reflected a

rent increase but otherwise contained the same provisions. *See* 56.1 ¶¶ 39-45. Greene was not a

party to either the 1998 or 2003 lease. 56.1 ¶¶ 33, 40. However, the lease incorporates by

reference the certification and recertification of tenant eligibility forms. *See* Waglow Decl. Ex. I,

at 13. These forms include a section on household composition where Lawless was required to

list the names of all individuals residing in the Apartment. *See, e.g., id.* Ex. J.

Lawless oversaw the family's compliance with Section 8's reporting and recertification

requirements. 56.1 ¶ 47; Greene Dep. 52:20-56:25. Although Greene was largely uninvolved,

she twice joined Lawless in signing the Section 8 recertification form as co-head of household,

and she recalls producing paystubs on a number of occasions for the purpose of reporting the

family's income. 56.1 ¶¶ 46-48; Greene Dep. 48:12-56:18.

At some time in or before 2007, and unbeknownst to Greene, Lawless verbally notified

an individual in the management office of the building that Greene was no longer residing in the

Apartment. *See* Waglow Decl. Ex. G ("Lawless Dep.") 18:21-19:22; 56.1 ¶ 50; Greene Dep.

57:14-20. Lawless did not submit, and Deshler did not ask for, a written request for Greene's

removal or proof substantiating her removal from the household. Lawless Dep. 58:2-12.

Lawless does not recall when she removed Greene's name from the household composition, nor

why, but admits that she had been a drug addict at the time and her memory of that period is a "total blur." *See id.* 18:21-19:15. Lawless had submitted notarized statements to Deshler reporting when two children and a grandchild moved out of the Apartment, but did not do so for Greene. 56.1 ¶ 50.

The recertification forms submitted by Lawless in 2007, 2008, 2009, 2010, and 2011 do not list Greene as a member of the household composition, despite the fact that Greene continued to reside in the Apartment.[3] *See* 56.1 ¶¶ 64, 65, 68, 71, 72, 76, 77, 80, 81, 85, 86. In each of those years, Greene was employed and her income should have been reported to properly calculate the Section 8 subsidy paid by HUD. 56.1 ¶¶ 65, 72, 77, 81, 86.

Lawless testified that, after she removed Greene from the household composition, she attempted for three consecutive years to re-add Greene during the recertification process, but Deshler refused. 56.1 ¶ 131; Lawless Dep. 20:1-21:21, 56:22-57:11. According to Lawless, Deshler informed her that family members removed from the composition could not be added later. Lawless Dep. 21:11-13. Lawless complained to property management but was unaware that she could or should contact CGI or HUD.[4] *Id.* 51:23-52:4, 56:22-57:11; 56.1 ¶ 88. Greene was never added back to the household composition. *See* 56.1 ¶¶ 64, 68, 71, 76, 80, 85.

---

[3] Other than documents from when Lawless and Greene first moved into Deshler Apartments, Greene's tenant file contains no forms prior to 2007. *See* Weaver Decl. ¶ 17, ECF No. 76; *see also* McCune Dep. 27:8-13 (explaining that Colon did not possess annual certification documentation prior to the time Manhattan North became Deshler's managing agent). In 2007, Manhattan North became Deshler's managing agent and assumed control of Deshler's tenant files. *See* 56.1 ¶ 13; Waglow Decl Ex. C ("Colon Dep. 2"), at 121:22-122:7. Pursuant to HUD guidelines, Manhattan North keeps prior tenant records for three years and moves older records to storage. Colon Dep. 2 at 122:17-124:24.

[4] Colon testified that he was never aware of Greene, or anyone on her behalf, attempting to add her to the household composition prior to 2011. Colon Dep. 2 at 149:25-150:5, 151:12-19.

In or about 2010, Lawless moved out of the Apartment. 56.1 ¶ 82; Lawless Dep. 26:19-27:5. Despite this, Lawless signed the annual recertification form in 2011. 56.1 ¶ 83. In 2012, Greene discovered that she had been removed from the household composition, Greene Dep. 58:3-5, and attempted to submit the annual Section 8 recertification paperwork to Deshler. 56.1 ¶ 87. Greene included a notarized letter from Lawless stating that Greene lived in the Apartment and "paid all of the bills," and requested that Deshler add Greene to, and remove Lawless from, the lease. *Id.* Deshler refused to accept Greene's recertification. 56.1 ¶ 89. According to Colon, Greene was unable to recertify because "she was never listed in the household." Colon Dep. 2 at 149:6-24.

After Greene attempted to submit the recertification paperwork, she received a notice to vacate the Apartment. 56.1 ¶ 89; Greene Dep. 90:6-24. Deshler commenced a licensee holdover proceeding against Greene, in which the Civil Court of the City of New York: Housing Part P found that Greene had resided in the Apartment since at least 2000 and that Greene successfully established a defense of succession under New York law. 56.1 ¶ 90; Waglow Decl. Ex. W; *see also Deshler Apartment Assocs. L.P. v. Lonnette Greene*, Index No. 82842/2012 (Civ. Ct. N.Y. Cty. Mar. 3, 2013). Deshler informed Greene that the court's decision did not entitle her to benefit of the Section 8 subsidy and that her rent would be raised to the market rate. 56.1 ¶ 92. Greene then sought assistance at HUD's office, where the employee identified as tasked with overseeing Deshler was "busy" and two other employees instructed Greene to return to the judge who had presided over the holdover proceeding to "clarify" his decision. 56.1 ¶ 93; Greene Dep. 91:9-96:7. Greene did so, whereupon the judge told her that he did not have jurisdiction to award Greene a Section 8 subsidy. 56.1 ¶ 94; Greene Dep. 94:16-22. Around the same time, Colon discussed Greene's case with Christine El Shahat at HUD, who expressed HUD's position

that Greene's request for a Section 8 subsidy should be denied. Colon Dep. 2 at 131:14-132:17; *cf.* McCune Dep. 9:2-10:15.

Following the court proceeding, Greene retained Mary McCune of Manhattan Legal Services, Inc. as counsel. Greene Dep. 95:10; McCune Dep. 6:11-14, 8:5-9. In December 2013, McCune participated in a conference call with Deshler's attorney, Colon, and El Shahat to discuss whether Greene was qualified to receive a Section 8 subsidy.[5] 56.1 ¶¶ 96, 162; McCune Dep. 6:11-8:18, 12:20-14:21. When HUD insisted that Greene was not a qualified tenant, McCune requested a waiver of the HUD guidelines, discussed below, that prevented Greene from qualifying to receive her mother's subsidy as a remaining member of a tenant family. 56.1 ¶ 96; McCune Dep. 14:22-15:22, 21:11-19. McCune offered to provide supporting documentation, but El Shahat denied the waiver and provided no further information on how the waiver might be obtained. 56.1 ¶ 100, 171, 172; McCune Dep 25:13-28:5. McCune testified that no one on the December 2013 conference call stated that a waiver request needed to be submitted in writing or requested that McCune submit a written request, 56.1 ¶ 179, and, as a result, Greene did not submit a written waiver request, 56.1 ¶ 95. El Shahat testified that she has never seen a waiver request and was not aware of anyone at HUD ever applying the waiver provision. 56.1 ¶ 175.

## II.    Statutes and Regulations

In 1974, Congress created the Section 8 housing program to "'ai[d] low-income families in obtaining a decent place to live' by subsidizing private landlords who would rent to low-income tenants." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 12 (1993) (alteration in original)

---

[5] El Shahat testified that she does not recall this conference call, explaining that she "speak[s] to thousands of people" and does not keep any records of her conversations with tenants regarding their subsidies for their apartments. El Shahat Dep. 16:13-17:9.

(citation omitted) (quoting 42 U.S.C. § 1437f(a)). Under the program, qualified tenants make reduced rent payments based on their income and ability to pay, and the tenants receive subsidies, through HUD "assistance payments" to the tenants' landlords, to cover the difference between the rent paid and the "contract rent" agreed upon by the landlord and HUD. *Id.*; *see also* 42 U.S.C. § 1437f(c)(3).

In order to be eligible to receive housing assistance, an applicant "must be a family" and "must be income-eligible." 24 C.F.R. § 5.653(b)(1). A "family" may consist of a single person, a "group of persons residing together," with or without children, and the "remaining member of a tenant family." *Id.* § 5.403; *see also* 42 U.S.C. § 1437a(b)(3). A family is income-eligible when its total annual income, *see* 24 C.F.R. §§ 5.609, 5.611, is too low to pay the approved gross rent, *id.* § 236.710. Once approved for assistance, a tenant family pays a percentage of its monthly income in rent. *See id.* § 5.628.

The owner of a project subsidized by HUD is responsible for selecting tenants. 42 U.S.C. § 1437f(d)(1)(A); 24 C.F.R. § 5.655(b). The owner must select an applicant if the owner determines that the applicant is "eligible and is otherwise acceptable and units are available." 24 C.F.R. § 880.603(b). Once a tenant is selected, the owner must reexamine the tenant's income and family composition each year in order to ensure the tenant continues to qualify for assistance. 42 U.S.C. §§ 1437a(a)(1), 1437f(c)(3); 24 C.F.R. § 880.603(c); *see also* U.S. Dep't Hous. & Urban Dev., *HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs* § 7-4.A (Nov. 2013) ("HUD Handbook"), *available at* http://portal.hud.gov/hudportal/documents/huddoc?id=43503HSGH.pdf.

Once selected, a Section 8 tenant must submit accurate documents during each annual reexamination. *See* 24 C.F.R. § 5.659(b)(2), (b)(4). Tenant families must also notify the owner

if the family's composition or income changes before the next reexamination, at which point the owner must conduct an interim reexamination to verify the family's continued eligibility for assistance or determine if adjustments to the tenant's subsidy are warranted. *See* 24 C.F.R. § 5.657(c); HUD Handbook §§ 7-10.A, 7-11.A; *see also* HUD Handbook § 7-12.A ("When a tenant . . . reports changes in income or other circumstances as required, the owner must take the following steps when processing an interim recertification[:] . . . 1. Interview the tenant to obtain information on the reported change. . . . 2. Obtain third-party verification of the income or other facts reported as changed since the last recertification and maintain documentation in the tenant file.").

Additionally, each member of a Section 8 family who is at least eighteen years old must sign a release and consent form at each annual reexamination authorizing HUD's access to financial documents. 24 C.F.R. §§ 5.659(c), 5.230; *see also* HUD Handbook § 3-11. Failure to sign a consent form is grounds for denial of admission to the subsidy program or termination of existing assistance. 24 C.F.R. § 5.232; HUD Handbook § 3-11. A tenant is entitled to notice and a hearing to discuss the proposed termination of assistance. HUD Handbook §§ 8-5, 8-6.

### III. HUD Handbook and Deshler Policies

To provide guidance to Section 8 tenants, owners, managers, and administrators, HUD created a handbook entitled "HUD Handbook 4350.3: Occupancy Requirements of Subsidized Multifamily Housing Programs" (the "HUD Handbook"), which explains the governing regulations and establishes policies for administering the program. 56.1 ¶¶ 2, 3. The Handbook is extensive, spanning hundreds of pages; relevant portions are described below.

### a. Owner's Responsibilities

Owners are responsible for determining an applicant's eligibility for Section 8 assistance. HUD Handbook § 3-4. In order to be eligible, a family must satisfy certain income requirements and its adult members must sign applicable consent and verification forms. *Id.* §§ 3-6, 3-11. Owners are responsible for verifying information pertaining to an applicant's eligibility. *Id.* §§ 3-25–3-27. They "may seek verification of family composition only if the owner has a clear written policy. Verification is not required." *Id.* § 3-27.

When rejecting applicants, owners must provide prompt written notification that states the reasons for the rejection and informs the applicant that she may dispute the rejection in writing or in a meeting within fourteen days. *See id.* § 4-9. If the applicant requests a meeting, it must be conducted "by a member of the owner's staff who was not involved in the initial decision to deny admission or assistance," and the owner must notify the applicant of its final decision with five days. *Id.* An owner "may" reject an applicant who, *inter alia*, is not eligible for Section 8 assistance or who does not "meet the owner's tenant screening criteria." *Id.*

Owners are required to request, and tenants[6] required to supply, information necessary for the owner to conduct an annual recertification of a family's income and composition. *Id.* §§ 7-1(B), 7-4. At the initial signing of the lease, and at each subsequent recertification, owners must notify tenants in writing of their obligations related to providing information for recertifications. *Id.* § 7-7. Tenants must sign and date the notice which the owner must keep in the tenant's file. *Id.* Owners must also provide written notice 120 days prior to the recertification, specifying the staff person who would be conducting the recertification, providing the person's contact

---

[6] A "tenant" is defined as "[a]n individual or family renting or occupying an assisted dwelling unit." HUD Handbook at Glossary (citing 24 C.F.R. § 5.504).

information, scheduling the tenant interview, and reminding the tenant of the information they are required to provide. *Id.* If the tenant fails to respond, the owner must provide additional notices, on the third instance warning the tenant that failure to recertify will result in loss of the tenant's housing subsidy and may result in eviction. *Id.* The owner is responsible for maintaining a record of each notice sent to and/or signed by the tenant. *Id.* The Handbook delineates the obligations of the owner and the tenant at recertification. *See id.* Fig. 7-3. The tenant and owner share responsibility to complete the recertification. *Id.* Generally, the owner must collect necessary information and obtain the signature of each adult member of the tenant household. *Id.*

### b. Program Violations and Termination Proceedings

If a tenant fails to recertify in time, her rent automatically increases to the market rate, and she will not receive a subsidy until she completes the recertification. *See id.* § 7-8. Upon late submission of recertification paperwork, the owner must inquire as to whether extenuating circumstances prevented the tenant from timely complying with her recertification obligations. *Id.* The tenant is entitled to submit evidence to establish these circumstances and she must be notified of the owner's decision and of the right to appeal a determination that extenuating circumstances were not present. *Id.* If the owner finds extenuating circumstances, the subsidy applies retroactively to the original recertification date. *Id.*

Tenants must notify the owner when a family member moves out of the unit, proposes to move into the unit, or when a family member's employment or income level changes. *Id.* § 7-10. The owner must verify submitted information, screen new family members, and interview the tenant to determine whether additional changes need to be reported. *See id.* §§ 7-11, 7-12. If an owner learns that a family's income or composition has changed, the owner must notify the

tenant of their reporting and recertification obligations, give them an opportunity to respond, and warn that failure to comply may result in loss of the family's subsidy or eviction. *Id.* § 7-12.

HUD requires owners to terminate a tenant's housing subsidy when a tenant fails to provide required information during recertification or when family composition and income changes, if the tenant fails to sign required consent forms, or the tenant otherwise becomes ineligible for assistance. *See id.* § 8-5. An owner "must" deny assistance to a household if "a tenant of any member of the tenants family refused to sign" required consent and verification forms. *Id.* § 5-21. An owner may also terminate a tenant's assistance for failure to comply with the owner's requirements contained in the lease, *see id.* §§ 8-11–8-13, but an owner is not permitted to terminate assistance based on any other factor, *see id.* § 8-5(G). An owner must provide a tenant with notice and an opportunity to respond before terminating assistance, *see id.* §§ 8-6(A), 8-13(B), and may reinstate assistance where, for example, the termination was due to a tenant's failure to recertify, was not due to fraud, and the tenant remains eligible for assistance, *id.* § 8-6(B).

The HUD Handbook also outlines steps an owner must take to determine if a tenant's "program violation"—that is, noncompliance with her lease or Section 8 program requirements—was due to tenant error or fraud, including independent investigation of the discrepancy, notifying and meeting with the tenant, and giving the tenant an opportunity to correct errors. *See id.* § 8-18. The tenant has a right to meet with an employee who was not involved in the investigation into the tenant's noncompliance, after which the owner must provide the tenant with a "written final decision, based solely on the facts presented and discussed at the meeting." *Id.* § 8-18(D). An owner may not "suspend, terminate, reduce or make a final denial of any benefits of a tenant until they have taken appropriate steps to

independently verify the tenant's information or the conflicting information." *Id.* § 8-18(C). An owner must treat a tenant's misrepresentation of information as unintentional unless intent can be "substantiated through documentation." *Id.* The Handbook then provides for redress in the event of tenant error, including the tenant's obligation to reimburse the owner for unpaid rent. *See id.* § 8-21.

     c.  <u>Family Member Departure Policies</u>

When the head of household leaves a Section 8 apartment, a determination must be made as to whether a "remaining member of the household will be eligible to receive assistance." *Id.* § 3-16. An individual is a "remaining member of a household" if she is "a party to the lease when the family member leaves the unit" and is "of legal contract age." *Id.* Although not all family members will be parties to the lease, the lease incorporates the annual certification forms, in which a family lists each member of the household. *See, e.g.*, Waglow Decl. Ex. I, at 13 (model lease for subsidized apartments stating that "[t]his Agreement and its Attachments make up the entire agreement between the Landlord and the Tenant regarding the unit," stating that the "Attachments are part of this Agreement," and listing the "Certification and Recertification of Tenant Eligibility" form as an attachment); *id.* Ex. J at 2-4 (Lawless's 2007 certification form requiring names, birth dates, and social security numbers for all residents, and signatures of all adult tenants).

When a family member is reported to have moved out, "[o]wners may also want to verify the departure," *id.* § 3-27, but such verification is not required, *see* Waglow Decl. Ex. D ("Carrington Dep."), at 45:22-46:12.[7] Colon testified that Manhattan North has established

---

[7] William D. Carrington is a senior project manager at HUD, Carrington Dep. 8:20-25, and is the project manager for Deshler Apartments, *id.* 14:19-22.

policies for verifying the departure of a family member. Colon Dep. 1 at 66:7-9. Specifically, Manhattan North requires "a notarized letter from the head of the household and a notarized letter from the person who's moving out, that they moved out. Plus, we want to see proof of when they moved." *Id.* at 66:9-13. Colon states that Manhattan North would require some proof that the individual moved out, such as "a lease, a bill, a phone bill, Con Ed bill, [or] a letter from the person that they're moved in with which would—preferably a notarized letter from that person." *Id.* at 66:24-67:7. Colon emphatically testified that he would want "to see proof they moved out. They have to give us a notarized letter, at minimum, minimum. Bare minimum, we want notarized statements." *Id.* at 67:13-16; *see also* Colon Dep. 2 87:10-88:1 ("They will have to report [a change in the household composition] to us. No one can be removed from the lease unless they give us a notarized letter requesting that the person be removed. If they're going to be removed, they have to—both parties, if it's an adult, they both have to give us notarized letters and show proof—especially if they're adults, we would require two notarized letters, one from each adult. The head of household always has to give a letter, and then if there's an adult moving out, they will also provide a letter. Plus verification of where they moved to.").

According to Carrington, if a person who believes she is entitled to become the head of household is denied that request, the person would have to "contact CGI or HUD, and ask [them] to investigate." Carrington Dep. 63:1-10. There is no Handbook provision governing this process, and the only means for a resident to learn about this is by complaining to the HUD project manager, who would then refer her to the contract administrator—in this case, CGI. *Id.* 63:11-64:18. CGI could then make a recommendation to the owner, but CGI may not have oversight. *Id.* 64:20-65:6.

d.  Waiver Process

Finally, HUD administrators—specifically, the "HUD Multifamily HUB Director, or other designated HUB or Field Office Multifamily Housing Official"— may waive Handbook guidelines that are not formally required by statute or regulation. *Id.* § 1-8(A).  Although HUD's representative testified that owners or applicants seeking a waiver must make their request in writing and provide supporting documentation, El Shahat Dep. 31:9-19, there is no formal process for seeking or granting a waiver prescribed by the Handbook or elsewhere, *see* HUD Handbook § 1-8; *see also* Carrington Dep. 70:9-11, 73:20-22, 74:10-15 (stating that he is unaware of any criteria for granting a waiver, unaware if there is a procedure for challenging a denial of a waiver, and unaware of any instance where HUD has applied the waiver provision); El Shahat Dep. 27:24-29:18.

**IV.  Procedural History**

Greene filed her complaint in this action on May 22, 2014, ECF No. 2, and her amended complaint on November 26, 2014, ECF No. 22 ("Am. Compl.").  Following discovery, HUD submitted motions for summary judgment and judgment on the pleadings on January 4, 2016. ECF Nos. 54, 57.  After reviewing the parties' submissions, the Court ordered additional briefing to address whether Plaintiff had a property interest in her family's Section 8 subsidy prior to her removal from the household composition and, if so, whether she was entitled to due process prior to her removal.  ECF No. 89.  In addition, the Court received *amici* briefs addressing those questions from The Legal Aid Society, Professor Paris R. Baldacci of the Cardozo School of Law, and The Public Advocate for the City of New York.  ECF Nos. 100, 102, 105.  At its request, HUD was afforded an opportunity to respond to the *amici*.  ECF Nos. 104, 106.

# DISCUSSION

## I.    Legal Standards

### a.  Motion for Judgment on the Pleadings

To survive a Rule 12(c) motion for judgment on the pleadings, a "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) ("The same standard applicable to [Rule 12(b)(6)] motions to dismiss applies to [Rule 12(c)] motions for judgment on the pleadings."). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In considering a Rule 12(c) motion, "a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013). The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-movant. *Johnson*, 569 F.3d at 43.

### b.  Motion for Summary Judgment

Summary judgment must be granted if the moving party shows there is no genuine dispute as to any material fact and it "is entitled to judgment as a matter of law." Fed. R. of Civ. P. 56(a); *see also Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Material facts are those

which, under the governing law, may affect the outcome of a case. *Id.* The moving party bears

the initial burden of establishing the absence of a genuine dispute of material fact by citing to

particulars in the record. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317,

322-25 (1986); *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). If the non-

moving party carries the burden of proof on specific issues, the movant may satisfy its own

initial burden by demonstrating that the adverse party cannot produce admissible evidence to

support an issue of fact. *Celotex,* 477 U.S. at 322-23; *PepsiCo Inc. v. Coca-Cola Co.,* 315 F.3d

101, 105 (2d Cir. 2002). In other words, the Court will grant summary judgment "against a party

who fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at

322.

     If the movant satisfies this burden, the opposing party must then "come forward with

'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd.*

*v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). In considering

a summary judgment motion, the Court must view the evidence in the light most favorable to the

non-moving party. *See Dickerson v. Napolitano,* 604 F.3d 732, 740 (2d Cir. 2010).

     c.  Administrative Procedure Act

     The legal standards for Federal Rules of Civil Procedure 12 and 56 do not apply to

Greene's claims arising under the APA. Where "a party seeks review of agency action under the

APA, the district judge sits as an appellate tribunal, and the entire case on review is a question of

law." *Assoc. of Proprietary Colls. v. Duncan,* 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015)

(internal quotation marks and citation omitted). "[T]he question whether [an agency] acted in an

arbitrary and capricious manner is a legal one which the district court can resolve on the agency

record—regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment (or in any other Rule 12 motion under the Federal Rules of Civil Procedure)." *Glara Fashion, Inc. v. Holder*, No. 11 Civ. 889, 2012 WL 352309, at \*5 (S.D.N.Y. Feb. 3, 2012) (quoting *Univ. Med. Ctr. v. Shalala,* 173 F.3d 438, 440 n.3 (D.C. Cir. 1999)).

## II.     Due Process

### a.   Legal Standard

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const., amend. V. This imposes "'constraints,' ordinarily in the form of notice and a pre-deprivation hearing, on 'governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause.'" *Assoc. of Proprietary Colls.*, 107 F. Supp. 3d at 347 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). When assessing a claim that a plaintiff's due process rights were violated, the Court must determine first "whether [the plaintiff] possessed a liberty or property interest" and, if so, "what process [s]he was due before [s]he could be deprived of that interest." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002). "Social welfare benefits have long been afforded constitutional protection as a species of property protected by the federal Due Process Clause," *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2005), and, accordingly, Section 8 beneficiaries have a constitutionally protected interest in the continued receipt of their subsidies, *see Rios v. Town of Huntington Housing Auth.*, 853 F. Supp. 2d 330, 337-38 (E.D.N.Y. 2012) (collecting cases).

Once an individual establishes that an entitlement of a protected interest, the Court must determine what process is due before an individual can be deprived of that interest. *See Kapps*,

404 F.3d at 118.  In doing so, the Court weighs "(1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 167-68 (2d Cir. 2001) (quoting *Mathews*, 424 U.S. 335).

b. Application

Greene alleges that HUD deprived her of due process in three instances: first, when Greene was removed from the household composition without Deshler verifying the removal or notifying Greene; second, when HUD denied Greene's continued receipt of her family's Section 8 subsidy for failure to appear on the lease; and third, when HUD refused to waive Handbook requirements for individuals to be considered remaining members of a tenant family. *See* Am. Compl. ¶¶ 35-39, 96-104, ¶¶ 119-124.  These three scenarios are addressed in turn.

i. Removal from Household Composition

Greene is able to support a due process claim based on her removal from her household composition in or before 2007.  As discussed below, the parties do not dispute that Greene was, prior to her removal, an authorized tenant and a beneficiary of housing assistance, and Greene had a legitimate claim of entitlement to the continued receipt of the benefit.  Although HUD contends that it was actions taken by Lawless, and not HUD, that terminated Greene's property interest, this argument is unavailing: as explained below, regulations, the HUD Handbook, Deshler's own policies, and common sense all dictate that HUD and Deshler had an obligation to verify that Greene had left the Apartment before terminating her property interest in the Section

8 subsidy. Greene was afforded no notice or process associated with this deprivation, in violation of the Due Process Clause. Accordingly, HUD's motions for summary judgment and judgment on the pleadings as to this deprivation are DENIED.

As a Section 8 beneficiary,[8] Greene had a legitimate claim of entitlement to, and protected property interest in, the continued receipt of the subsidy. *See, e.g., A.S. v. Been*, No. 16 Civ. 4067, 2017 WL 448961, at *2 (S.D.N.Y. Jan. 23, 2017) ("A termination of [Section 8 voucher payments] or voucher holders' participation in the program constitutes a deprivation [of property interests] that would entitle them to procedural safeguards." (alterations in original) (quoting *Junior v. City of N.Y., Hous. Pres. & Dev. Corp.*, No. 12 Civ. 3846, 2013 WL 646464, at *6 (S.D.N.Y. Jan. 18, 2013)); *see also Basco v. Machin*, 514 F.3d 1177, 1182 n.7 (11th Cir. 2008) ("The Supreme Court reasoned [in *Goldberg v. Kelly*, 397 U.S. 254, 266 (1970),] that the interests of the recipient in the uninterrupted provision of benefits and of the State in not wrongly terminating benefits outweighed the State's competing interest in summary adjudication. This reasoning applies with equal force to public housing assistance provided pursuant to Section 8, where eligible participants rely on subsidies to meet their basic need for housing." (citation omitted)); *Escalera v. N.Y. City Hous. Auth.*, 425 F.2d 853, 861 (2d Cir. 1970) ("The government cannot deprive a private citizen of his continued tenancy, without affording him adequate procedural safeguards even if public housing could be deemed to be a privilege."); *Rios*, 853 F.

_____

[8] As an authorized tenant in the Apartment, Greene was a beneficiary of housing assistance. The Section 8 program is designed to "ai[d] low-income *families* in obtaining a decent place to live." 42 U.S.C. § 1437f(a) (emphasis added). A "family" includes a "group of persons residing together," with or without children, and also includes the "remaining member of a tenant family." 24 C.F.R. § 5.403; *see also* 42 U.S.C. § 1437a(b)(3); *cf.* 24 C.F.R. § 5.504 (defining "tenant" to mean "an individual or a family renting or occupying an assisted dwelling unit"). Under the Section 8 project-based assistance, in which Greene's family participated, "rental assistance is paid for *families* who live in specific housing developments or units." 24 C.F.R. § 982.1(b)(1) (emphasis added).

Supp. 2d at 337-38 (holding that an existing Section 8 housing tenant has a constitutionally protected interest, and collecting cases).

Greene's removal from the housing composition deprived her of her entitlement to the continued receipt of the subsidy. As HUD has made clear, under § 3-16 of the HUD Handbook, Greene's removal from the household composition made her ineligible to be considered a remaining member of a tenant family and, thus, ineligible to continue to receive the Section 8 subsidy.

HUD's argument that it was Lawless' action, and not HUD's, that deprived Greene of her property interest is unavailing. On the contrary, it is Deshler's removal of Greene, and refusal to add her, that deprived Greene of her property interest. Perhaps for this reason, HUD regulations, the HUD Handbook, and Deshler policy all require independent verification when an individual is removed from the household composition. For instance, HUD regulations require an owner to conduct annual reexaminations of family income and composition and to conduct interim reexaminations upon a family's request. *See* 24 C.F.R. § 5.657; *see also id.* § 5.659. The HUD Handbook also indicates that owners may want to verify a family member's departure. HUD Handbook § 3-27. And as Colon made clear in deposition, it is Manhattan North's policy to do so, requiring a notarized letter from the head of the household, a notarized letter from the person moving out, and proof that the individual moved out, such as a new lease or phone bill. Colon Dep. 1 at 66:9-67:16; Colon Dep. 2 at 87:10-88:1. These procedural safeguards all protect an individual's property interest in their Section 8 subsidy, but none were afforded to Greene.

Because Greene had a legitimate claim of entitlement that was deprived by her removal from the household composition, the next question is "what process [Greene was] due before [she] could be deprived of that interest." *Kapps*, 404 F.3d at 118 (quoting *Sealed v. Sealed*, 332

F.3d 51, 55 (2d Cir. 2003)). HUD, in its motion, argues only that Greene did not have a legitimate property interest in the family's Section 8 subsidy, and does not engage in a discussion of the *Eldridge* factors. For purposes of HUD's motions, however, the Court concludes that such an analysis is unnecessary. "At a minimum, due process requires that the government provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Weinstein v. Albright*, 261 F.3d 127, 134 (2d Cir. 2001) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)); *see also Kapps*, 404 F.3d at 124 ("[C]laimants must, therefore, be afforded enough information to understand the basis for the agency's action in all instances."). As discussed above, Greene received no notice of her removal from the household composition and resulting termination of her Section 8 benefits. Without a modicum of due process, Greene's due process rights were violated, and judgment in HUD's favor would be improper.

Finally, in its reply and supplemental briefing, HUD repeatedly argues that Lawless and Greene violated the terms of the lease and failed to comply with Section 8 obligations by failing to include Greene, and her income, on the recertification forms in 2007 and onward. This argument is irrelevant. Even assuming that Lawless and Greene were in violation, neither Lawless' nor Greene's Section 8 benefits could be terminated without due process. HUD regulations require that a family have the opportunity to participate in an informal hearing to consider whether a decision "relating to the individual circumstances of a participant family [is] in accordance with the law [and] HUD regulations," including determinations "to terminate assistance to a participant family because of the family's action or failure to act." 24 C.F.R. § 982.555(a)(1); *id.* § 983.2 (stating that part 982, which applies to the tenant-based voucher program, also applies to the project-based program, with certain exceptions, and not excluding

subpart L, which describes denial and termination of assistance and includes § 982.554 and § 982.555); *see also* 42 U.S.C. § 1437f(d)(1)(B)(iv) ("[A]ny termination of tenancy shall be preceded by the owner's provision of written notice to the tenant specifying the grounds for such action."). Similarly, in the HUD Handbook, in the event of a "program violation," the tenant has a right to meet with an employee of the owner and the owner must provide the tenant with a "written final decision, based solely on the facts presented and discussed at the meeting." *Id.* § 8-18(D). An owner may not "suspend, terminate, reduce or make a final denial of any benefits of a tenant until they have taken appropriate steps to independently verify the tenant's information or the conflicting information." *Id.* § 8-18(C). The Handbook similarly requires that an owner provide notice to a tenant and an opportunity to respond before terminating assistance. HUD Handbook §§ 8-6(A), 8-13(B).

In sum, Greene possessed a legitimate claim of entitlement to the continued receipt of the Section 8 subsidy and was denied it without her knowledge or consent and without notice or due process, in violation of the Constitution and applicable regulations. Because Greene was entitled to some notice and opportunity to respond regarding the termination of her Section 8 subsidy, HUD's motions for summary judgment and judgment on the pleadings as to Greene's initial removal from the household composition form are DENIED.

ii. 2012 Denial of Section 8 Subsidy

Greene can also sustain a due process cause of action on the basis of Deshler and HUD's denial in 2012 of Greene's Section 8 subsidy request because Greene, although she was not entitled to her mother's Section 8 subsidy as a remaining family member, was entitled to due process as a Section 8 applicant.

As discussed above, Greene's legitimate property interest was wrongfully extinguished when she was removed from the household composition in or before 2007. In 2012, Greene was not a party to the lease or included on the housing composition forms when Lawless left the Apartment and, therefore, under § 3-16 of the HUD Handbook, Greene was not eligible to be considered a remaining member of a tenant family. Accordingly, she did not have a "legitimate claim of entitlement" to Lawless' Section 8 subsidy. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

However, "courts have held that merely applying for Section 8 housing entitles an individual to certain due process rights . . . . 'Even if Plaintiff was not entitled to receive housing assistance, pursuant to [the public housing agency's] own guidelines, he was entitled to receive certain hearings and the opportunity to be heard once he applied.'" *Been*, 2017 WL 448961, at *2 (citation omitted) (quoting *Barfield v. Plano Hous. Auth.*, No. 11 Civ. 206, 2012 WL 3135892, at *6 (E.D. Tex. July 6, 2012), *report and recommendation adopted*, 2012 WL 3135674 (E.D. Tex. Aug. 1, 2012)).

Applicants for public benefits—as opposed to those who have already secured those benefits—have, in certain circumstances, a protected interest meriting due process protection. For a state or federal law to confer a protected interest, it must give an individual a "legitimate claim of entitlement" to a benefit, and not merely a "unilateral expectation" of receiving a benefit. *Roth*, 408 U.S. at 577. An applicant for benefits, therefore, "may possess a property interest in the receipt of public welfare entitlements" where the "statutory scheme in question mandates award of the benefit upon satisfaction of specified criteria." *Kapps*, 404 F.3d at 116. In such a circumstance, an applicant "has a limited but sufficient interest in the receipt of that benefit to warrant some measure of . . . protection in demonstrating [her] eligibility." *Id.*

(internal quotation marks and citation omitted). Ultimately, "[w]hether a benefit invests the applicant with a claim of entitlement or merely a unilateral expectation is determined by the amount of discretion the disbursing agency retains." *Colson v. Sillman*, 35 F.3d 106, 108 (2d Cir. 1994).

Courts have found that Section 8 applicants are entitled to due process protections. For example, the Ninth Circuit held that a Section 8 applicant cannot be denied benefits without due process. *Ressler v. Pierce*, 692 F.2d 1212, 1216 (9th Cir. 1982). The court determined that applicants possess a protected interest because HUD regulations and policies "closely circumscribe an owner's discretion" in selecting applicants, because eligible applicants belong to the "class of individuals whom the Section 8 program was intended to benefit," and because the circumstances of the case—in which an applicant was foreclosed from applying for Section 8 based upon an owner's misrepresentation that benefits were not available—provided a "compelling argument for affording at least some due process safeguards to Section 8 applicants." *Id.* at 1215-16; *see also, e.g.*, *Davis v. Mansfield Metro. Hous. Auth.*, 751 F.2d 180, 185 (6th Cir. 1984) ("Due process requires that an applicant for the Section Eight existing housing program be able to request an informal hearing if he has been denied eligibility based on an outstanding claim for alleged past rent or damages. Written notice to the applicant must set forth the allegations on which the denial was based and the method for requesting a hearing.").[9]

---

[9] In one opinion, the Seventh Circuit seemed to disagree, finding that "Congress left responsibility for . . . selection of [Section 8] tenants with the private owner," whom the governing regulations afford discretion in choosing among applicants. *Eidson v. Pierce*, 745 F.2d 453, 457-59 (7th Cir. 1984) (citing 24 C.F.R. § 883.318, which tasks the owner with determining whether an applicant is eligible and "otherwise acceptable," and HUD Handbook § 3-8, which authorizes owners to develop procedures for determining whether an applicant would be a "responsible tenant"). The Seventh Circuit reasoned that although the law establishes certain eligibility criteria, an individual who proves that she meets those criteria is not yet "entitled" to housing because an owner remains unconstrained in deciding whether the applicant

The Court joins the other courts in this Circuit that find *Ressler* persuasive. *See, e.g., Rios*, 853 F. Supp. 2d at 337-38; *Price ex rel. Torres v. Rochester Hous. Auth.*, No. 04 Civ. 301, 2006 WL 2827165, at *6 (W.D.N.Y. Sept. 29, 2006). Given the extensive regulations regarding the selection of tenants, *see, e.g.*, 24 C.F.R. § 983.251, the Court agrees with *Ressler* that a Section 8 project's owner's discretion is sufficiently circumscribed such that applicants to Section 8 housing possess a protected interest and are entitled to some due process safeguards.

In *Ressler*, the plaintiff merely "inquired about the Section 8 subsidies and was told by an employee . . . that none were available," and she was neither given nor submitted a written application. 692 F.2d at 1214. Here, it is undisputed that Greene attempted to submit annual recertification paperwork in 2012, 56.1 ¶ 87, but never received written notice of Deshler's and HUD's decision[10] to deny her request, nor any information about how to challenge the decision, 56.1 ¶¶ 138, 146-49. Given these facts, and viewing the evidence in the light most favorable to Greene, *Dickerson*, 604 F.3d at 740, the Court concludes that Greene had a legitimate claim of entitlement sufficient to give rise to a due process claim.

"The Due Process Clause does not demand that the government provide the same kind of procedural protections for every deprivation of a property or liberty interest." *Weinstein*, 261

---

would be an acceptable tenant. *See id.* at 460-61. However, the Seventh Circuit has clarified that its holding in *Eidson* is more narrow: "In *Eidson* we did not address the issue of what due process rights an individual has when his application for eligibility for Section 8 is denied. Rather, we addressed the issue of what due process rights an eligible applicant has when he is denied housing *at a specific residence.*" *Fincher v. S. Bend Heritage Found.*, 606 F.3d 331, 335 (7th Cir. 2010) (emphasis added). Thus, *Eidson* is distinguishable from both *Ressler* and the present case, where Greene has challenged the denial of a Section 8 subsidy and not her right to a specific housing request. *See, e.g.*, Am. Compl. 23-24 (prayer for relief).

[10] Although the details are not entirely clear, Colon discussed Greene's case with El Shahat at HUD, who allegedly expressed HUD's position that Greene should be denied a Section 8 subsidy. Colon Dep. 1 at 54:23-55:11; Colon Dep. 2 131:14-132:17; *cf.* McCune Dep. 9:2-10:15.

F.3d at 134. As *Ressler* acknowledged, "an *applicant* for governmental benefits[] has a less weighty interest than someone who is currently receiving benefits and is threatened with reduction or termination of those benefits." 692 F.2d at 1217 (citing *Richardson v. Perales*, 402 U.S. 389, 406-07 (1971)). Here, however, Greene received no notice and no explanation. As discussed above, this is constitutionally insufficient. *See Weinstein*, 261 F.3d at 134 (requiring, at a minimum, reasonably calculated notice under the circumstances and an opportunity to present objections). In fact, the HUD Handbook requires that rejected applicants be given notice and an opportunity to respond, requiring that rejection notices be in writing and include the "specifically stated reason(s) for the rejection" and that the applicant be informed that she has a right to respond to the owner in writing or request a meeting within 14 days to dispute the rejection. HUD Handbook § 4-9(C); *see also* 24 C.F.R. § 982.554(a) (requiring "prompt notice of a decision denying assistance to the applicant" which "must contain a brief statement of the reasons" and "state that the applicant may request an informal review").

The Court need not address the question of what process Greene was due, as the fact that Greene was deprived a property interest without any due process—having received no notice of HUD's decision nor an opportunity to present her objections—is sufficient to defeat HUD's motions for judgment on the pleadings and summary judgment. HUD's motions as to Greene's claims related to her 2012 denial of benefits are, therefore, DENIED.

### iii. Refusal to Waive Handbook Requirement

Greene is unable to bring a due process cause of action on the basis of HUD's refusal to grant a waiver pursuant to HUD Handbook § 1-8(A) because HUD's decision did not deprive Greene of a property right. Given that HUD has discretion to grant waivers, Greene cannot assert a legitimate claim of entitlement sufficient to trigger due process protections.

As the Supreme Court has made clear: "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. "A 'legitimate claim of entitlement' exists where, under applicable . . . law, 'absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted.'" *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 504 (2d Cir. 2001) (quoting *Walz v. Town of Smithtown*, 46 F.3d 162, 168 (2d Cir. 1995)). Accordingly, "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005); *see also, e.g.*, *Mordukhaev v. Daus*, 457 F. App'x 16, 20 (2d Cir. 2012) ("[T]he existence of . . . subjective criteria by which to determine a plaintiff's eligibility for a benefit demonstrated that the municipal body retained sufficient discretion to negate plaintiff's legitimate claim of entitlement.").

Because HUD has discretion in granting or denying waivers—under the HUD Handbook, a waiver may only be granted when the Handbook's directives are not required by statute or regulation, *see* HUD Handbook §1-8(A)—Greene does not have a legitimate claim of entitlement to a waiver. *See, e.g.*, *Sealed*, 332 F.3d at 56 ("Where the administrative scheme does not require a certain outcome, but merely *authorizes* particular actions and remedies, the scheme does not create 'entitlements' that receive constitutional protection under the Fourteenth Amendment."); *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 995 (2d Cir. 1997) (holding that government's "discretion to decide whether or not to grant a waiver . . . precludes any legitimate claim of entitlement").

It may be true that HUD failed to follow its own procedures—for example, by orally denying Greene's verbal waiver request rather than instructing her to file a written request that would be reviewed and responded to by written decision. *See, e.g.*, El Shahat Dep. 31:9-19. However, "[a] breach of procedural requirements does not create a due process violation unless an individual was 'denied a fair forum for protecting his . . . rights.'" *McDarby v. Dinkins*, 907 F.2d 1334, 1337 (2d Cir. 1990) (quoting *Atencio v. Board of Educ.*, 658 F.2d 774, 779-80 (10th Cir. 1981)).

Accordingly, HUD's motions for judgment on the pleadings and summary judgment with respect to Greene's due process claims related to the denial of her waiver request are GRANTED.

## III.    Administrative Procedure Act

Plaintiff's complaint alleges four violations of her rights under the Administrative Procedure Act: first, for denying Plaintiff's request for a waiver of the HUD Handbook requirement regarding remaining family members, Am. Compl. ¶¶ 97-104; second, for affirming Deshler's violations of the Housing Assistance Payments contract as to Greene's removal from the household composition and loss of the Section 8 subsidy, Am. Compl. ¶¶ 120-124; third, for refusing to recognize her right to the Section 8 subsidy under the terms of her lease, Am. Compl. ¶¶ 131-133; and fourth, for refusing to continue the Section 8 subsidy and for raising the rent to the fair market, Am. Compl. ¶¶ 142-44.[11]

---

[11] The parties do not brief which, if any, of these causes of action are final agency actions. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). Indeed, HUD's motions only discuss the first of the four claims: "Summary judgment in favor of HUD is also appropriate with respect to Plaintiff Greene's APA *claim* because there is no evidence that HUD was legally required to grant Plaintiff Greene a waiver or that HUD's refusal to grant Plaintiff a

a. 5 U.S.C. § 706(1)

HUD is correct that Greene's APA claim cannot arise under § 706(1), which allows a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed." As HUD argues, a claim under § 706(1) "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." Def. Mem. 39 (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004)). Here, Plaintiff takes issue not with agency inaction, but with a variety of HUD's actions. As indicated by the complaint's repeated invocation of the "arbitrary and capricious" standard, it is clear that Plaintiff seeks judicial review under § 706(2). *See, e.g.*, Am. Compl. ¶¶ 104, 123, 133.

b. 5 U.S.C. § 706(2)

The APA authorizes a district court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" based on a review of "the whole record or those parts of it cited by a party." 5 U.S.C. § 706(2).

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Glara Fashion*, 2012 WL 352309, at *1 n.1 (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). Accordingly, Rule 56.1 statements are not generally

---

waiver of its Handbook provision was arbitrary, capricious, or an abuse of discretion." Def. Mem. L. Supp. Mot. Summ. J. ("Def. Mem.") 38-39 (emphasis added), ECF No. 58.

helpful or required in APA causes of action, as the 56.1 statement would "not aid the court in its independent review of the [administrative] record." *Glara Fashion*, 2012 WL 352309, at *1 n.1 (alteration in original) (quoting *Student X. v. New York City Dep't of Educ.*, No. 07 Civ. 2316, 2008 WL 4890440, at *11 (E.D.N.Y. Oct. 30, 2008)).

"An agency abuses its discretion when it fails to present a rational explanation for its decision or if the decision is devoid of any reasoning." *Id.* at *6 (citing *Sinistovic v. Holder*, 429 F. App'x 37, 39 (2d Cir. 2011); *Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 93 (2d Cir. 2001)). "[I]t is for the Court to determine whether the agency has 'considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action.'" *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (quoting *J. Andrew Lange, Inc. v. FAA*, 208 F.3d 389, 391 (2d Cir. 2000)). "When an agency 'fail[s] to provide a reasoned explanation . . . [the court] must undo its action." *Water Quality Ins. Syndicate v. United States*, No. 15 Civ. 789, 2016 WL 7410549, at *13 (D.D.C. Dec. 22, 2016) (alterations in original) (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999)); *see also Jackson v. Mabus*, 919 F. Supp. 2d 117, 121 (D.D.C. 2013) (finding agency action arbitrary and capricious where agency "failed to address any facts found, let alone[] provide an adequate explanation connecting those facts to its decision"). An agency's decision "stands or falls on its express findings and reasoning." *Higgins v. U.S. R.R. Ret. Bd.*, 264 F. App'x 29, 31 (2d Cir. 2008) (quoting *Vargas v. INS*, 938 F.2d 358, 363 (2d Cir. 1991)).

The Court has carefully reviewed the submissions from the parties on these motions and cannot identify the relevant administrative record regarding Plaintiff's APA claims. On the contrary, it appears that much of the record does not exist. For instance, although HUD asserts that it is an undisputed fact that HUD denied Plaintiff's request for a waiver pursuant to the HUD

Handbook, 56.1 ¶ 100 ("In denying the request for a waiver, the HUD representative said . . . ."),

HUD concedes that it has no record of that request or its denial, Decl. of Christine El Shahat

¶¶ 13-14, ECF No. 59 (noting that HUD has no documentation of a written waiver request); El

Shahat Dep. 28:11-17 (testifying that she does not recall ever receiving a waiver request); *id.* at

32:22-24 (testifying that she does not recall considering Greene's waiver request). HUD's

failure to articulate its reasons in a way that would allow for judicial review is a clear violation of

the APA.

Thus, the Court is unable to grant HUD's motions for judgment on the pleadings and

summary judgment without an administrative record to consider. "Since a court must assess

agency action exclusively on the basis of the administrative record, it cannot entertain a case

under the Administrative Procedure Act if the administrative records being challenged are not

before it." *Air Espana v. Una Brien*, No. 95 Civ. 1650, 1997 WL 469992, at \*9 (E.D.N.Y. June

18, 1997) (citing *United States v. Garcia,* 844 F.2d 1528 (11th Cir. 1988)), *aff'd in part and*

*vacated in part sub nom. Air Espana v. Brien*, 165 F.3d 148 (2d Cir. 1999). When "an agency's

failure to state its reasoning or to adopt an intelligible decisional standard is . . . glaring . . . we

can declare with confidence that the agency action was arbitrary and capricious." *Foster v.*

*Mabus*, 103 F. Supp. 3d 95, 108-09 (D.D.C. 2015) (omissions in original) (quoting *Select*

*Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014)). "At the very

least, the agency must have reviewed relevant data and articulated a satisfactory explanation

establishing a 'rational connection between the facts found and the choice made.'" *Id.* at 109

(quoting *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 249

(D.C. Cir. 2013)).

Because there appears to be no administrative record that articulates even the barest explanation for its decision, the Court concludes that HUD was arbitrary and capricious, and, therefore, HUD's motions for judgment on the pleadings and summary judgment with respect to Greene's APA claims are DENIED. *See Jackson*, 919 F. Supp. 2d at 121.

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Therefore, there cannot be, as Plaintiff posits, "material facts . . . for [Greene's APA claims] to be tried." Pl. Mem. L. Opp. to Def. Mot. Summ. J. 47, ECF No. 78. On the contrary, the proper result is to remand the case to HUD for further proceedings consistent with this Memorandum Opinion and Order. *See, e.g.*, *Jackson*, 919 F. Supp. 2d at 121; *Nat. Res. Def. Council, Inc. v. Fox*, 30 F. Supp. 2d 369, 384-85 (S.D.N.Y. 1998) (Where the "administrative record is nonexistent or incomplete in some important respect; that the explanations set forth in the record are inadequate to justify the action taken; or that the record contains material inconsistencies," a court "cannot intelligently perform [its] reviewing function" based solely on the administrative record, and the court should "remand to the agency for additional investigation or explanation." (alteration in original) (quoting *Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043, 1052 (2d Cir. 1985))); *see also City Club of N.Y. v. United States Army Corps of Eng'rs*, No. 16 Civ. 3934, 2017 WL 1102667, at *10 (S.D.N.Y. Mar. 23, 2017)).

Accordingly, the Court DENIES HUD's motions for judgment on the pleadings and summary judgment with respect to Greene's APA claims.

## CONCLUSION

For the reasons stated above, HUD's motions are GRANTED in part and DENIED in part. It is further ORDERED that:

1. Greene and HUD shall confer to craft a proposal as to how to proceed regarding Greene's remaining due process claims, including whether these claims should be stayed pending remand of Plaintiff's APA claims to HUD;

2. Greene and Deshler shall confer to craft a proposal as to how to proceed regarding Greene's claims against Deshler, which were held in abeyance pending resolution of HUD's motions, *see* ECF No. 52; and

3. By **July 6, 2017**, the parties shall file a joint letter with their proposals as to how to proceed, including whether they believe a settlement conference before the Honorable Gabriel W. Gorenstein might be productive.

The Court will review this letter and proceed accordingly.

SO ORDERED.

Dated: June 14, 2017
New York, New York

_____
ANALISA TORRES
United States District Judge